**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**PIKEVILLE DIVISION**

IN RE:

**MARROWBONE CLINIC PHARMACY, INC.**                              **CASE NO. 12-70065**

**DEBTOR**

**PHAEDRA SPRADLIN, SOLELY IN HER**
**CAPACITY AS THE CHAPTER 7 TRUSTEE**
**OF MARROWBONE CLINIC PHARMACY, INC.**                          **PLAINTIFF**

**VS.**                                          **ADVERSARY CASE NO. 13-7007**

**SHARON B. HUFFMAN, SOLELY IN HER**
**CAPACITY AS THE EXECUTRIX OF THE**
**ESTATE OF JAMES R. HUFFMAN, DECEASED**                          **DEFENDANT**


**MEMORANDUM OPINION, ORDER, AND**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff is the Trustee of Debtor Marrowbone Clinic Pharmacy, Inc.  The Trustee has

sued the estate of Debtor's former "pharmacist-in-charge," James R. Huffman, under a variety of

legal theories all premised on her claim that Mr. Huffman (now deceased) misappropriated funds

from the pharmacy during his employment.  Each of the six causes of action requires a finding

that, at a minimum, Mr. Huffman deposited the Debtor's cash, without consideration, into his

personal bank accounts.  The Defendant, Mr. Huffman's estate, denies these claims and asserts

counterclaims against the Debtor pharmacy for breach of contract, promissory estoppel and

unjust enrichment premised on the pharmacy's alleged failure to issue thirty percent of its stock

to Mr. Huffman.

This was an unusual case.  The star witness for both parties, William McCoy, one of the

Debtor's two principals, is dead.  None of the many living persons who might have shed light on

the transactions underlying this proceeding testified.  The Trustee offered no documentary

evidence or live testimony that anyone stole from the Debtor; the Defendant offered no

documentary evidence of the contract that supports her counterclaim, or live testimony from any

of the parties to the contract.  The Court is left to interpret a handful of exhibits against the

background of counsel's arguments.  Largely because of this lack of evidence, the Court neither

finds for the Plaintiff on any of her claims, nor for the Defendant on any of its counterclaims.

### SUMMARY JUDGMENT ORDERS AND THE TRIAL

A trial was held on February 25, 2014.  Prior to the commencement of the trial, the Court

heard argument on the parties' Motions for Summary Judgment [Docs. 44, 45].  From the bench,

the Court DENIED the Plaintiff's Motion [Doc. 45] and DENIED in part Defendant's Motion

[Doc. 44] as to Count V.  [Plaintiff's Fraud by Omission claim, Doc. 3, ¶¶ 43-51].  The

remainder of Defendant's Motion was submitted for decision.

The Court now DENIES the remainder of Defendant's Motion, finding that as to

Defendant's request for summary judgment on Count II [Plaintiff's Fraudulent Transfer claim,

Doc. 3, ¶¶ 24-32], there existed genuine issues of material fact which were resolved at trial, and

that Defendant's request for summary judgment based on arguments that Counts III, IV, VI and

VII of the Amended Complaint are barred by applicable statutes of limitations is MOOT as a

result of the Court's proposed findings of fact and conclusions of law set forth below.

Pursuant to a pretrial order, the parties filed Joint Stipulations of Facts and Exhibits,

which are discussed as relevant below in the Court's findings of fact.  The testimony offered by

both parties was scant.  In support of her case, the Plaintiff called attorney John Morgan, prior

counsel to the Plaintiff, for the sole purpose of authenticating certain bank statements from Mr.

Huffman's account at Community Trust Bank for admission into evidence.  No testimony was

elicited regarding these statements.  The Plaintiff next presented Kathy Taylor, a representative

of Community Trust Bank, who appeared pursuant to a subpoena duces tecum issued by Plaintiff

to the bank.  Defendant objected to Ms. Taylor's testimony and document production as the

exhibits at issue had not been previously identified, exchanged or filed as required by the pretrial

order.  The Court sustained the Bank's objection and Plaintiff excused Ms. Taylor.  As reviewed

in more detail below, the Plaintiff Trustee only testified regarding the merits of a filed proof of

claim.  The final testimony offered by Plaintiff was through the deposition of William McCoy,

who died several weeks before trial.[1]

The sole live witness offered by the Defendant was Sharon Huffman, Mr. Huffman's

wife and the executrix of his estate.  Mrs. Huffman testified generally about her and her

husband's sources of income and Mr. Huffman's employment by the pharmacy.  The Defendant

also moved into evidence her cross-examination of McCoy in his deposition.

At the conclusion of the trial, the Court took this matter under submission and ordered the

parties to supplement the record regarding their objections in the McCoy deposition.  The

Plaintiff withdrew all of her objections, and the Court has, by separate order, sustained all but

one of the Defendant's objections, many of which were to the form of the question.

In addition, post-trial, Plaintiff filed a "Damage Claim," which summarizes the cash

deposits into certain Community Trust Bank accounts for the years 2008-2010 ($302,979.98)

claiming that the cash deposits constitute the Plaintiff's damages.

The Court, having now reviewed the evidence and being sufficiently advised, hereby

makes the following findings of fact and conclusions of law.

---

[1] McCoy's deposition was taken on July 23, 2013 at his home.  The record does not reflect the state of McCoy's
health at the time of the deposition.

The Court has jurisdiction of this matter under 28 U.S.C. § 1334(b) and Joint Local Civil Rule 83.12 of the Eastern and Western Districts of Kentucky.  Venue is proper under 28 U.S.C. § 1409(a).  Whether the parties' claims are core or non-core is discussed in the Court's conclusions of law with respect to the individual claims.

## THE PLAINTIFF'S CLAIMS

**FINDINGS OF FACT**

The Debtor Pharmacy.

In 1976, William McCoy and Laythe Sykes founded a pharmacy in Pikeville, Kentucky. In 1998, they incorporated that pharmacy as Marrowbone Clinic Pharmacy, Inc., with 100 authorized shares.  Russell Johnson, then the "pharmacist-in-charge" at Marrowbone, received 30 of those shares.  McCoy and Sykes each owned 35 shares.   In January of 2004, Johnson died. Mr. Huffman was hired to replace him as the "pharmacist-in-charge" to operate the pharmacy. Mr. McCoy's bookkeeper, Diane Watkins, and Mr. Sykes' wife, Francis Sykes, assisted with the pharmacy books.  Beverly Lockhart, Mr. Huffman's sister, was the pharmacy's office manager. Mrs. Sykes and Ms. Watkins, as well as Sykes and McCoy, made deposits, including cash deposits, for the Debtor.  Mr. Huffman was the Debtor's pharmacist-in-charge until mid-2011, when he resigned his post and opened a pharmacy of his own.  On August 16, 2012, Mr. Huffman died.

Thefts from the Pharmacy.

1.      The July 2008 Missing Cash.  In July 2008, McCoy discovered, with the help of his bookkeeper Diane Watkins and Mrs. Sykes, that the Debtor's cash deposits were approximately $150,000 less than its cash receipts.  McCoy and Mr. Sykes then held a meeting with Mr. Huffman and his sister, Beverly Lockhart, to discuss the missing money.  Although

neither Mr. Huffman nor Lockhart had access to the Debtor's bank account, they did have access

to the pharmacy's cash receipts.  McCoy testified that he did not accuse Mr. Huffman of

anything during this meeting, because he "didn't know who got [the money]."  [Doc. 59-1 at 39.]

Neither Mr. Huffman nor Lockhart confessed to stealing, though McCoy vaguely suggested that

in the same meeting Mr. Huffman and/or Lockhart admitted to billing insurance companies for

fictitious prescriptions to make the pharmacy more profitable.  McCoy testified that "we told

them to quit that . . ." [*Id.* at 54.]  After this meeting, the pharmacy's cash receipts and deposits

started matching up.  As a result, McCoy suspected Mr. Huffman of theft; however, because he

was unable to find a replacement pharmacist, McCoy chose to retain Mr. Huffman because "you

have to have a pharmacist to keep a drugstore open." [*Id.* at 49.]

      2.    <u>The December 2008 Missing Co-Pays</u>.  McCoy testified that in December 2008,

he discovered a new theft scheme at the pharmacy.  The insurance companies that insured the

Debtor's customers usually charged a $20 co-pay per prescription.  But during the five months

following the July 2008 "missing cash" meeting with Mr. Huffman and Lockhart, the Debtor's

records showed, or appeared to show, that customers were only being charged two dollars per

co-pay.  McCoy inferred that someone who worked for the Debtor was charging customers the

normal amount, doctoring the receipts to show a two dollar charge, and pocketing the difference.

McCoy was unable to quantify how much the Debtor lost as a result of this diversion of its co-

pays, testifying only that prior to this discovery, the Debtor received between $400 and $600 per

day in co-pays.  McCoy testified that he never confronted Huffman or Lockhart about the

missing co-pays, explaining that he and Sykes were still "getting [their] ducks in a row" when the Pike Circuit Court appointed a receiver to manage the Debtor.[2]  [*Id.* at 45.]

<u>The Appointment of the Receiver</u>.

On November 19, 2004, Chris Johnson, administrator of the Johnson Estate, filed an action in the Pike Circuit Court seeking a judicial dissolution of the Debtor and the appointment of a receiver based on a claim that McCoy and Sykes increased their management fees so as to deny the Johnson Estate profit distributions.  Five years later, finding that McCoy and Sykes had acted in a fraudulent manner within the meaning of KY. REV. STAT. § 271B.14-300, the Pike Circuit Court appointed Stephen Hogg on February 12, 2010, as custodian to manage the pharmacy's business and as receiver to wind up and liquidate the corporation.  That order was reversed and the matter remanded by the Kentucky Court of Appeals on December 2, 2011.  Two months later, the Debtor filed its chapter 7 bankruptcy proceeding, in part, to avoid another trial of the Johnson Estate claims.

<u>The Oxycodone Purchases</u>.

McCoy testified that after the receiver's appointment, he discovered still another larcenous scheme at the pharmacy.  Monitoring the Debtor's drug orders, he noticed that the pharmacy was purchasing an excessive amount of oxycodone–approximately 1200 pills every other day.  At trial, Plaintiff withdrew these allegations as a basis for her claims.  *See* discussion *infra* at pages 10-11.

<u>Did someone steal from the Debtor</u>?

The Trustee's proof on this point was extraordinarily weak.  The Trustee offered no documentary or forensic evidence that showed a loss of funds.  The Trustee did not testify to any

---

[2] McCoy testified that the receiver was appointed in January 2009; however, the record is clear that the Pike Circuit Court did not appoint a receiver until February 2010.  Either McCoy's explanation of his failure to investigate the co-pays is inaccurate, or his recollection of when he discovered the co-pay diversion was off by a year.

investigation of the theft she claims occurred. Mr. Sykes, the surviving principal of the

company, who McCoy testified played a role in the Debtor's investigation of the theft years ago,

did not testify. Neither did Diane Watkins, Sykes's bookkeeper, nor Mrs. Sykes, both of whom

McCoy testified helped him discover the missing cash. The court-appointed receiver who

managed the Debtor's affairs for over a year did not testify. The only evidence of theft the

Trustee presented was McCoy's testimony regarding the cash shortfalls and diversions of co-

pays. McCoy was unable to quantify the latter and could only give a rough amount, "150 some

thousand dollars," for the former. [Doc. 59-1 at 38.] In light of the uncontroverted testimony

that the Debtor suffered large, unexplained cash shortfalls, the Court finds by a bare

preponderance of the evidence that someone stole from the Debtor. But the paucity of the

evidence of theft and the absence of any evidence quantifying how much was stolen, does affect

the Court's judgment on whether it was Mr. Huffman who stole from the Debtor.

Was Mr. Huffman the thief?

Plaintiff relies on two pieces of evidence to prove it was Mr. Huffman who stole from the

Debtor. Plaintiff relies on McCoy's testimony that after the Debtor's principals met with Mr.

Huffman and Lockhart, one form of theft stopped (the missing cash) and another started (the

missing co-pays). Plaintiff buttresses her conclusion that Mr. Huffman was the thief based on

the fact that Mr. Huffman made large, unexplained cash deposits into his bank accounts which

were in excess of his reported income. These facts, without more, are insufficient to establish by

a preponderance of the evidence that Mr. Huffman stole from the Debtor.

First, the Court has doubts about the credibility and veracity of McCoy's testimony.

Specifically, it is difficult to believe that an innocent owner merely discussed the missing cash

with Mr. Huffman and took no further steps to either investigate the identity of the thief or report

any alleged misappropriations to law enforcement.  This is especially implausible in light of the fact that McCoy testified that Mr. Huffman and Lockhart freely admitted in the July 2008 meeting to making insurance claims for phony prescriptions, thereby exposing the Debtor to potential criminal liability.  McCoy's explanation of his conduct—that he couldn't find a replacement for Mr. Huffman and needed a pharmacist to run the pharmacy—is dubious at best.  McCoy's willingness to let the pharmacy continue to operate in the hands of a confessed insurance fraudster whom he suspected of putting the pharmacy in tenuous financial condition strains credulity.  Likewise, his explanation regarding his failure to take action as a result of the alleged missing co-pays because he couldn't identify the wrongdoer rings hollow.

Even if the Court fully credited McCoy's testimony about the July 2008 meeting and the cessation of one theft scheme and the inception of another immediately after it, it hardly follows that it was Mr. Huffman who stole from the pharmacy.  There were *four* persons present at the meeting—Mr. Huffman, Lockhart, McCoy, and Sykes.  And, two others were aware of the discovery of the cash shortfall that shortly preceded the meeting—Mrs. Sykes, and Diane Watkins, McCoy's bookkeeper.  As noted above, Mrs. Sykes and Watkins, as well as Mr. Sykes and McCoy himself, made cash deposits for the debtor.  Therefore, all that can be reasonably inferred from the events which followed the meeting is that any one or more of the six people who were either at the meeting, or were aware of the Debtor's discovery of the cash shortfall, was responsible for the theft.  Specifically, if Mr. Sykes, Mrs. Sykes, or Watkins, all of whom had access to the Debtor's cash, were stealing, it would make sense that they would stop stealing shortly after McCoy discovered the theft.  There is no evidence that makes it any more likely that Mr. Huffman, rather than one of the other five persons who knew that the Debtor discovered theft, was responsible.  Nor is there any evidence which would support a finding that, if Lockhart

were involved, Mr. Huffman likely was too.  There is nothing in the record about the relationship between the two siblings and no evidence which suggests that Lockhart could not have stolen without her brother's help.

Plaintiff argues that the large unexplained cash deposits in Mr. Huffman's personal accounts, in excess of Mr. Huffman's reported income, are sufficient to identify him as the thief. The Trustee moved the records of two of Mr. Huffman's personal checking accounts at Community Trust Bank into evidence, which the Trustee contends show that Mr. Huffman deposited in excess of $300,000 in cash between July 30, 2007 and December 6, 2010.  That these deposits are unexplained is true enough.  Mr. and Mrs. Huffman's joint tax returns for the years 2007 through 2011 show that Mr. Huffman earned less than $90,000 per year from his employment by the Debtor and that the couple's joint income for the same period never exceeded $141,000 per year.  Mrs. Huffman testified to a number of sources of funds which she and her husband received in addition to Mr. Huffman's salary: loans from banks or family members, inheritances, home insurance proceeds, and redeemed savings bonds.  She did not testify, however, that any of these funds were disbursed in cash, and it seems unlikely that any of them were.

That Mr. Huffman deposited slightly over $300,000 into his personal accounts between 2007 and 2010, and the absence of any reasonable explanation from the Defendant for this, does give rise to an inference of illegal activity.  But Plaintiff has offered no evidence that the illegal activity in which Mr. Huffman was engaged was stealing from the Debtor.  There is no evidence connecting Mr. Huffman's cash deposits to the Debtor's cash shortfalls and the record suggests there is no clear connection to be drawn.  McCoy testified that over $150,000 in cash had been stolen by July 2008; the Plaintiff's own summary exhibit shows that through July 2008, Mr.

Huffman only made $27,327.10 in unexplained cash deposits, and only made $2,250.01 in cash deposits the following month. [Doc. 72 at 4.] On the other hand, the total amount of cash deposits, which Plaintiff states is the amount of her damages claim, substantially exceeds the amount of cash McCoy testified was stolen—even accounting for the co-pay scheme.

The evidence suggests a different source of Mr. Huffman's cash than theft from the Debtor pharmacy—illicit drug sales from several sources. The record contains evidence of both illegal sales of prescription drug samples and of oxycodone. Exhibit 1 to Plaintiff's complaint is a federal indictment, dated August 1, 2012, which charged Mr. Huffman with selling prescription drug samples provided to him by Thad Manning, D.O., a cotenant in the buildings where Mr. Huffman served as a pharmacist—first at the Debtor's premises, then at a second pharmacy opened by Mr. Huffman. The indictment states that audits revealed Debtor had "huge overages in non-narcotic drugs"—734,556 dosages over a forty-six month period. [Doc. 3-1 at 1.] Mr. Huffman was never tried for these charges because he died fifteen days after being indicted.[3] But the sale of "huge" quantities of prescription drug samples is at the very least a viable alternative explanation for Mr. Huffman's cash deposits and one which does not involve the theft of any of the Debtor's funds.

The record also contains evidence that Mr. Huffman may have trafficked in oxycodone. McCoy testified that after the receiver was appointed to run the pharmacy, the pharmacy started making enormous purchases of oxycodone and filling out-of-state prescriptions for oxycodone, from which he reasonably inferred that Mr. Huffman was illegally dealing in oxycodone. In her trial brief, the Plaintiff initially trumpeted Mr. Huffman's oxycodone dealings as "another way money was being stolen from the Debtor" [Doc. 61 at 7], and wrote that Mr. Huffman

---

[3] According to the Trustee's complaint, Mr. Huffman's death was by suicide. Defendant's answer neither confirmed nor denied this allegation.

overbought oxycodone in order to "pocket more cash from daily sales of exorbitant amounts of drugs through the Debtor." *Id.* at 13. At trial, however, Defendant's counsel represented to the Court that he represented Lockhart in a criminal trial for her involvement in an oxycodone-dealing conspiracy run out of Debtor's pharmacy, and argued that any cash proceeds from illegal trafficking in oxycodone would belong to the government, not the Debtor. At this point, Plaintiff's counsel disclaimed any reliance on McCoy's testimony about oxycodone, stating that Plaintiff's case was entirely a case about cash theft. However, the testimony on which Plaintiff disclaims reliance suggests that Mr. Huffman may have earned his cash through illegal oxycodone sales, not by stealing it from Debtor's registers.

In sum, the Plaintiff presented evidence which barely supports a finding that someone stole cash from the Debtor. She presented testimony of questionable credibility which, if credited, would merely support a finding that Mr. Huffman was one of the six most likely suspects of that theft. She presented evidence which shows that Mr. Huffman probably had some illicit source of cash. Finally, she presented evidence which directly connects Mr. Huffman to the sale of prescription drug samples and oxycodone. Given that evidence, and the absence of any evidence specifically linking Mr. Huffman to cash theft from the pharmacy, the Court cannot find that Mr. Huffman obtained his cash by wrongfully taking it from the Debtor. Preponderance of the evidence is commonly defined as "evidence that is of greater weight, on balance, than that offered in opposition to it." *Benge v. Johnson*, 474 F.3d 236, 248 (6th Cir. 2007). Here, the evidence that Mr. Huffman obtained the cash deposited in his accounts by means other than theft from the pharmacy is of equal or greater weight than the evidence that he misappropriated the Debtor's cash.

**CONCLUSIONS OF LAW**

As noted above, an element of each of Plaintiff's claims requires a finding that Mr.

Huffman took cash from the Debtor.  The first count of Plaintiff's amended complaint [Doc. 3]

was dismissed by agreement.

Fraudulent Transfer.

Count II is a state-law fraudulent transfer claim under KY. REV. STAT. § 378.020, made

pursuant to the Plaintiff's strong-arm power under § 544(b) of the Bankruptcy Code.  11 U.S.C.

§ 544.  The fraudulent transfer claim is core, and the Court has statutory and constitutional

authority to enter a final judgment on this Count.  *See* 28 U.S.C. § 157(b)(2)(H) (providing that

fraudulent transfer claims are core); *Official Comm. Of Unsecured Creditors of Appalachian*

*Fuels, LLC v. Energy Coal Res., Inc. (In re Appalachian Fuels, LLC)*, 472 B.R. 731, 741 (E.D.

Ky. 2012) (Bunning, J.) (holding that bankruptcy courts may constitutionally enter final

judgment in fraudulent transfer claims); *Merv Props., LLC v. Fifth Third Bank (In re Merv*

*Props., LLC)*, No. 5:14-007, 2014 WL 201614, at *3 n.5 (E.D. Ky. Jan. 17, 2014) (Reeves, J.)

(same).  Section 378.020 voids transfers made without valuable consideration as to existing

creditors.  Section 544(b) voids transfers that are voidable under applicable law, including state

law, by a creditor holding an allowable unsecured claim.  To prevail, the Trustee must prove that

(i) a transfer was made from the Debtor to Mr. Huffman without valuable consideration, (ii) an

unsecured creditor holding an allowable unsecured claim in the Debtor's bankruptcy case exists,

and (iii) the creditor was a creditor at the time of the transfers.

First, the Court finds, as explained above, that there was insufficient evidence of transfers

lacking consideration made from the Debtor to Mr. Huffman.  Moreover, the Trustee failed to

show an existing creditor who holds an allowable unsecured claim.  At trial, the Trustee argued

that the Johnson Estate's proof of claim, filed in Debtor's bankruptcy case, was such a claim.

However, on cross-examination, the Trustee refused to concede that the claim was allowable,

stating only that she hadn't started looking at the claims yet and that it was her tentative opinion

that "a portion" of the claim would be allowable.

It is the Trustee's burden to prove the elements of § 544(b); merely testifying that a claim

*may be* allowable does not suffice.  A contrary result would allow the Trustee to stand in the

shoes of the Johnson Estate, avoid fraudulent transfers to Mr. Huffman, and then object to the

Johnson Estate's claim in its entirety.  To satisfy her burden, the Trustee was required to, at a

minimum, concede the Johnson Estate's claim was allowable.[4]  *See Belfance v. Bushey (In re*

*Bushey)*, 210 B.R. 95, 101 (B.A.P. 6th Cir. 1997) ("Section 544(b) imposes only one 'standing'

requirement . . . independent of the state law cause of action asserted by the trustee: the creditor

must hold an allowable unsecured claim, determined under the allowance rules of the

Bankruptcy Code.").

<u>Plaintiff's Non-Core Claims</u>.

Plaintiff's conversion claim, unjust enrichment claim, fraud by omission claim, and

negligence per se claims, the last of which are grounded in state criminal theft statutes, are non-

core claims that are only related to Debtor's bankruptcy case.  This Court is permitted to decide

non-core claims with the parties' consent, but Defendant did not consent.  Therefore, this Court

only has authority to submit proposed findings of fact and conclusions of law with respect to

those claims.  *See* 28 U.S.C. § 157(c)(1).  Accordingly, with respect to the non-core claims, the

foregoing findings of fact shall be deemed proposed findings of fact and the following

---

[4] Had Defendant continued to dispute the claim's allowability, the Trustee would have been further required to affirmatively prove allowability.  *See Mills v. Webster (In re Multimedia Commc'ns Grp. Wireless Assocs.)*, 212 B.R. 1006 (Bankr. M.D. Fla. 1997).

conclusions of law shall be deemed proposed conclusions of law pursuant to 28 U.S.C.

§ 157(c)(1) and FED. R. BANKR. P. 9033.

Conversion.

Count III of the Plaintiff's amended complaint is a claim for conversion. Conversion is a

tort action for "the wrongful exercise of dominion and control over property of another." *State

Auto. Mut. Ins. Co. v. Chrysler Credit Corp.*, 792 S.W.2d 626, 627 (Ky. Ct. App. 1990). A

successful claim of conversion, under Kentucky law, requires a showing that:

> (1) the plaintiff had legal title to the converted property; (2) the plaintiff had
> possession of the property or the right to possess it at the time of the conversion;
> (3) the defendant exercised dominion over the property in a manner which denied
> the plaintiff's rights to use and enjoy the property and which was to the
> defendant's own use and beneficial enjoyment; (4) the defendant intended to
> interfere with the plaintiff's possession; (5) the plaintiff made some demand for
> the property's return which the defendant refused; (6) the defendant's act was the
> legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered
> damage by the loss of the property.

*Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n.12 (Ky.

2005). For the reasons explained above, the court finds that the Plaintiff Trustee failed to prove,

at a minimum, that Mr. Huffman exercised dominion over the Debtor's cash receipts in a manner

which denied the Debtor use and enjoyment of the cash.

Unjust Enrichment.

Count IV of the Plaintiff's amended complaint is an unjust enrichment claim. Under

Kentucky law, unjust enrichment has three elements–a "benefit conferred upon defendant at

plaintiff's expense," "a resulting appreciation of benefit by defendant," and "inequitable

retention of [the] benefit without payment for its value." *Guerin v. Fulkerson*, 354 S.W.3d 161,

165 (Ky. Ct. App. 2011). In her complaint, Plaintiff claims that the benefit the Huffman Estate

inequitably retained is the Debtor's funds, which Mr. Huffman unlawfully misappropriated. For

the reasons explained above, the Court finds the Plaintiff has not met her burden on this element.

14

Fraud by Omission.

Count V of the Plaintiff's amended complaint is a fraud by omission claim.  In Kentucky,

fraud must be proven by clear and convincing evidence.  *See United Parcel Serv. Co. v. Rickert*,

996 S.W.2d 464, 468 (Ky. 1999).  The Trustee claims that Mr. Huffman misappropriated the

Debtor's funds, and that his fiduciary relationship with the Debtor obligated him to disclose that

misappropriation.  The Plaintiff alleges that he failed to disclose the misappropriation, and that

his failure induced the Debtor to continue Mr. Huffman's employment, thereby causing the

Debtor to suffer damages from Mr. Huffman's continued misappropriation of Debtor's funds.

The parties disagree on whether Mr. Huffman owed a fiduciary duty to the Debtor.  The Court

need not address that issue, however, because, for the reasons stated above, the Trustee has failed

to show clear and convincing evidence that Mr. Huffman misappropriated the Debtor's funds.

Negligence Per Se.

Counts VI  and VII of the Plaintiff's amended complaint are claims for theft in violation

of KY. REV. STAT. §§ 514.070 and 514.030, respectively, made pursuant to Kentucky's

negligence per se statute, KY. REV. STAT. § 446.070.  Section 514.070 criminalizes theft by

failure to make required disposition of property.  The elements are, first, obtaining property upon

an agreement or a known legal obligation to make a specified payment or other disposition from

that property; and second, intentionally dealing with the property as one's own and failing to

make the required payment or disposition.  Section 514.030 criminalizes theft by unlawful

taking.  A person is guilty of theft by unlawful taking, under Section 514.030, when he

unlawfully takes or exercises control over movable property of another with intent to deprive

him thereof.  KY. REV. STAT. § 514.030(1)(a).  To make a negligence per se claim for a violation

of a statute under Section 446.070, a plaintiff must show that he is within the class of persons

which the violated statute was intended to protect.  *Davidson v. Am. Freightways, Inc.*, 25

S.W.3d 94, 99-100 (Ky. 2000).

Both of the Trustee's negligence per se claims fail because, for the reasons stated above,

Trustee has failed to meet her burden to prove that Mr. Huffman misappropriated or otherwise

converted to his personal use the Debtor's funds in any amount.

## THE DEFENDANT'S COUNTERCLAIMS

Defendant makes three counterclaims against Plaintiff, all based on the Debtor's alleged

failure to honor Mr. Huffman's employment agreement with the Debtor.  Factually, Defendant

alleges that the terms of Mr. Huffman's employment as "pharmacist-in-charge," like that of his

predecessor, Mr. Johnson, included an agreement to provide Mr. Huffman with thirty percent of

the share of the Debtor's stock.  Of course, to accomplish this, the Debtor would have to retrieve

those shares from the Johnson Estate, which did not occur.  Defendant's counterclaims are all

claims against the Debtor's estate and are, therefore, core matters upon which the Court may

enter final judgment.  28 U.S.C. § 157(b)(2)(B).

Count I of Defendant's counterclaim is a breach of contract claim, which alleges that

Debtor failed to sell an equity stake to Mr. Huffman in breach of his employment agreement.

Count II of the counterclaim is a promissory estoppel claim, premised on the breach of the same

promise.  Count III of the counterclaim is an unjust enrichment claim.  As to this claim,

Defendant seeks a refund of salary, which it claims was deferred towards Mr. Huffman's future

purchase of an equity stake in the Debtor.

Defendant has two overarching, distinct, and alternative theories of recovery.  First, either

by way of breach of contract or promissory estoppel, Defendant seeks the value of the Johnson

Estate's shares, which it claims the Debtor promised but failed to convey to Mr. Huffman.

16

Second, on a theory of unjust enrichment, it seeks the sum total of the credits towards a purchase

of the stock which Mr. Huffman received, which she claims was deferred salary.  Both theories

of recovery fail.

**FINDINGS OF FACT**

When Mr. Huffman was hired in 2004, the Debtor agreed to pay Huffman an annual

salary of $72,000, a car allowance of $10,200, and an $1,800 monthly credit towards an eventual

purchase, by Mr. Huffman, of Johnson's shares in the Debtor in the event that the Debtor

succeeded in buying back the shares from Johnson's estate.  The parties dispute the nature of the

credits.  Defendant claims that they were deferred salary, and that Mr. Huffman's salary was

reduced by the amount of the credits.  Mrs. Huffman attempted to bolster this claim in her

testimony, describing Mr. Huffman's excitement at the possibility of becoming a shareholder of

the Debtor and, over the objection of the Plaintiff, describing her understanding of Mr.

Huffman's agreement with the Debtor to acquire an ownership interest in the pharmacy.[5]  The

Trustee claims that they were simply credits and could not be redeemed for cash in the event the

Debtor failed to buy back the Johnson shares.  Defendant's claim that the credits were really

deferred salary, rather than non-redeemable credits, is unsupported by McCoy's or Mrs.

Huffman's testimony.  McCoy testified that Mr. Huffman's $72,000 salary was the going rate for

a pharmacist at the time, which tends to negate the possibility that the credits—$21,600 a year,

or thirty percent of Mr. Huffman's salary—were deferred salary.

---

[5] Post-trial, the Plaintiff moved to strike Mrs. Huffman's testimony regarding the terms of Mr. Huffman's
employment agreement as impermissible hearsay, *see* Doc. 77, to which the Defendant objected, *see* Doc. 81.  As
explained herein, Mrs. Huffman's testimony in this regard is given no weight; the deposition testimony of McCoy
makes clear that Mrs. Huffman was not present when the oral arrangement was discussed, and her testimony has
little credibility given her admitted ignorance of her husband's affairs, including the existence of certain financial
accounts.

After Johnson's death, the Debtor engaged in negotiations with the Johnson Estate to buy

Johnson's shares back, and made five offers for them, ranging from $53,000 to $150,000.  Each

offer was rejected.  McCoy testified that the Debtor failed to reacquire the shares because of

Chris Johnson's unreasonable demands, and that Johnson believed the Debtor was worth

$3 million and wanted roughly $1 million for his shares.  No evidence was offered by either

party at trial regarding the shares' actual value.

Although the parties disagree on the nature of the credits that Mr. Huffman received,

there is basic agreement between the parties on the terms of the contract that are relevant to

Defendant's breach of contract claim.  McCoy testified in his deposition that Mr. Huffman would

receive a credit of $1,800 a month towards an eventual purchase of the shares, and that Mr.

Huffman would be given an opportunity to buy the Johnson shares back at such time that the

Debtor reacquired those shares.  The parties agree that this was the agreement.  Defendant claims

that the agreement also contained a promise "to take affirmative steps to purchase [the shares]

and sell them to Mr. Huffman." [Doc. 45 at 5.]  Plaintiff disagrees, but the disagreement is

immaterial because Plaintiff concedes that the Debtor had an implied duty of good faith to make

reasonable efforts to buy the shares back.  The Court finds that there was an enforceable contract

between the Debtor and Mr. Huffman to allocate credits in the amount of $1,800 per month

towards an eventual purchase of Debtor's stock, in return for Mr. Huffman's work.

## CONCLUSIONS OF LAW

<u>Breach of Contract</u>.

The parties agree on the applicable law to Defendant's breach of contract claim.  Under

Kentucky law, a contract conditioned on the occurrence of a future event is not enforceable if the

future event does not come to pass.  *See, e.g.*, *Collings v. Scheen*, 415 S.W.2d 589 (Ky. 1967).

18

However, if a party to an agreement causes the failure of a condition precedent, he cannot rely upon the condition's failure to defeat his liability. *See Cowden Mfg. Co, Inc. v. Sys. Equip. Lessors, Inc.*, 608 S.W.2d 58, 61 (Ky. Ct. App. 1980). The parties agree that the standard for determining whether Debtor was the cause of the failure of the condition precedent is whether Debtor made reasonable efforts to buy the shares back. The Court accepts this standard as correct. Thus, the only dispute to resolve the Defendant's breach of contract claim is whether Debtor's efforts to buy the shares back were reasonable. The Court holds they were.

As reviewed above, the Debtor made five offers to buy the Johnson shares back, for amounts ranging from $53,000 to $150,000. McCoy testified that the Debtor failed to reacquire the shares because of Chris Johnson's unreasonable demands, and that Johnson believed the Debtor was worth $3 million and wanted roughly $1 million for his shares. Defendant put on no evidence to show that the Debtor's offers were unreasonable, that Johnson's valuation of the shares was reasonable, or that Debtor's efforts to buy the shares back were unreasonable in any other way. The Court finds that the Debtor's efforts to buy the shares back were reasonable Plaintiff is entitled to judgment on Defendant's breach of contract claim.

Promissory Estoppel.

Defendant's next claim is a promissory estoppel claim. Defendant argues, in alternative to her breach of contract claim, that if there were no contract on the shares, Debtor's promise to sell Mr. Huffman the Johnson shares induced Mr. Huffman to reasonably rely on that promise and work for the Debtor. Therefore, the promise should be enforced and the value of the shares paid to Huffman. The Court has already held that there was an enforceable contract between the Debtor and Huffman on the shares; thus, Defendant's alternative theory of recovery for the shares' value, which assumes there was no contract, fails.

<u>Unjust Enrichment</u>.

Finally, Defendant makes an unjust enrichment claim, arguing that the Debtor was unjustly enriched by $160,000—the amount of the credits allocated to Mr. Huffman while in the Debtor's employ, which Defendant argues were deferred from Mr. Huffman's salary and unjustly retained when Debtor failed to purchase the Johnson Estate's shares.  This claim fails because as found above, its factual premise, i.e., that the credits were deferred salary, is mistaken.

As explained above, for an unjust enrichment claim to succeed under Kentucky law, three elements must be present: a benefit conferred upon defendant at plaintiff's expense, a resulting appreciation of benefit by defendant, and inequitable retention of that benefit without payment for its value.  Defendant argues that Debtor inequitably retained $160,000 of Mr. Huffman's deferred salary.  But that argument depends entirely on the mischaracterization of Mr. Huffman's credit as deferred salary, subtracted from his total compensation to be paid at a later date.  The credits were not deferred salary, but rather, simply credits allocated towards a future purchase of stock, a benefit in addition to Mr. Huffman's salary. Hence, there was nothing inequitable about their retention in the event that the Debtor failed to reacquire stock to sell to Mr. Huffman.

## CONCLUSION

The Court will grant judgment to the Defendant on Plaintiff's fraudulent transfer claim (Count II), and to the Plaintiff on Defendant's counterclaims.  A Judgment in conformity herewith shall be entered.

Pursuant to Rule 9033, the Court hereby recommends that the District Court adopt the proposed findings of fact and conclusions of law set forth herein and enter judgment in favor of

the Defendant on Plaintiff's conversion, unjust enrichment, fraud, and negligence per se claims

(Counts III-VII).

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
**_Tracey N. Wise_**
**Bankruptcy Judge**
**Dated: Wednesday, May 07, 2014**
**(tnw)**